First case this afternoon is Judy v. Bank Champaign. That's case number 4100442 for the appellant, Mr. Kirchner, and for the appellee, Mr. Berticchio. Berticchio, you may proceed. We're here on appeal from orders entered in the Circuit Court of Champaign County which essentially resolved a second amended complaint filed on behalf of the plaintiff by a dismissal of the pleadings and a subsequent entry of judgment on the pleadings as to the count which remained following the 2619. The second amended complaint in this case essentially alleges that my client, Mr. Judy, who at one time was the co-guardian of his mother's estate, who was a co-executor of her estate subsequent to her death, and the trustee who handled the estate assets and acted as a custodian of the guardianship assets, Bank Champaign, the defendant in this case. So those are the parties involved by the time of the second amended complaint, and the reason I raised it in that fashion is there's a statute of limitations argument which involves a relation back and a voluntary dismissal under 13217 and a refiling, so I wanted to frame that second amended complaint. But essentially, it was a breach of fiduciary duty claim which was originally brought, originally in this action, by Mr. Judy reflecting upon and arising from his responsibilities as a co-executor, as a co-guardian of the estate, and in his individual capacity as a beneficiary of the trust. The reason that beneficiary status becomes important and also is relevant to the limitations issue is because in the record, in the record in this case before you, what is reflected is that upon his mother, Sarah's death, the estate proceedings and the estate assets essentially rolled into a trust of which he is a one-third beneficiary. And so the guardianship assets, which were then rolled into the estate proceedings at her death, and the estate assets, then roll into the trust of which he is a one-third beneficiary, and it is that standing and that relationship to the trust assets and the guardianship assets, which we argued below, Are you saying that all the assets for now roll into one single trust at the time of this litigation? The trust document provides that the estate assets will roll into it. The estate is still open, I believe. So ultimately, the guardianship assets become part of the estate on Sarah's death. The estate assets roll into, ultimately for distribution, the trust under the terms of the will and the trust. Does the trust, does it provide that it goes on past the close of probate? No, there would be a distribution. There would be a distribution at the end of probate? Yes. Alright. So, the circuit court was originally presented with a motion to dismiss the second amended complaint, and at the time of the filing of the second amended complaint, the plaintiff, who had originally filed asserting these various capacities, refiled a second amended complaint with Lieva Court in his individual capacity, alleging that, as a beneficiary of the trust, there was a breach of fiduciary duty by Bank Champagne, and as a beneficiary of the trust into which the guardianship assets flowed, he had standing to pursue a breach of fiduciary duty with respect to the management of those assets. The guardianship had long ceased by virtue of her death. The heart of the allegations involved a very specific set of transactions, number two. Bank Champagne had been faced with pleadings and communications indicating that the co-exec, the co-guardians of the estate believed they had been mismanaging funds. And Bank Champagne agreed to resign its position as trustee and as the custodian of these guardianship assets, and did so on December 31st of 2001. December 28th, just three days prior to that, and then on December 31st, the day on which they resigned, they removed from the guardianship account and the two trusts which they were administering, one for Sarah, my client's mother, one for Durwood, his father, approximately $262,000. $262,632.93, they said. They just took it. $140,000 of that amount they took claiming that because of the threat of litigation over the mismanagement of the guardianship and trust assets, they had to engage counsel in Chicago for the threat of litigation, and counsel in Champagne County, and had to pay them $40,000. $40,000 and $100,000 as an advanced retainer. Didn't they refer to that as the Kirshner litigation? They did. They did. Because in representing my client, we communicated with them and filed pleadings indicating they had been mismanaging the assets. And so it was our communications about that mismanagement which they styled as Kirshner litigation. $140,000 within days of tendering the resignation as trustee and custodian of the guardianship accounts, they simply took. They took an additional $122,632.93 in addition to the $140,000, claiming it was a termination fee for their own use and benefit. So on the eve of that acceptance of resignation by the court, they took over a quarter of a million dollars. Now, the background here becomes relevant because the trust... It's my understanding, and please correct me if I'm wrong, that the attorney fees they took weren't for attorney services already provided. They were prospective. Correct. That is correct, Your Honor. That background becomes important because under the terms of the trust, and this is reflected in the quoted portion at page 11 of our initial brief, under the terms of the trust, the trust document provides that the trustee will make an annual accounting and, quote, So the motion to dismiss, which was granted by the court, hinged and was pivotal with respect to this language in the trust document for which the court said there was no sufficient written objection to them having taken that money. Within that 60-day period, therefore, the breach of fiduciary duty claim could not proceed. In the briefs filed on behalf of the bank in this case, the bank indicates, as did the court, that an objection filed by the successor trustee, which was strategic capital, was insufficient to constitute a written objection for purposes of that language in the trust document. And the written objection to which the court referred and counsel referred in the brief is at 652 of the record. In that objection, the successor trustee, strategic capital, says that we have some concerns regarding the fees that were taken. We want an explanation of the $140,000 that was taken, and then goes on to inquire into some other matters. That was February 6th of 2002, so clearly within the 60-day period. The circuit court said that that letter, which expressed concerns about what had been done, was insufficient to constitute an objection for purposes of the trust document. There was no evidence presented to the court with respect to how to interpret this trust document or what language should require in terms of the manner of communicating an objection, how detailed or specific it should be. It simply requires that it be a written objection. Did you argue to the trial court that the petition for emergency relief filed by your client satisfied the written objection requirement? I did. And that petition for emergency relief is appendixed as well to our reply brief as the first document in the appendix. It was filed February 6th of 2002 at A1. And in that document, the petition for emergency relief, we specifically set out these transfers that had been taken from the accounts as being unlawful, improper, and requested emergency relief with respect to ordering that those be returned to the guardianship account and the trust account. The court discounted entirely the fact that we had filed a petition for emergency relief, served it upon Bank Champaign, implying that because it was filed in the guardianship case, it was insufficient to be a written objection and the objection had to come from the trustee, which is a position that the bank adopts in this appeal. It couldn't come from my client. The petition for emergency relief is clearly in writing. It clearly sets out not only the objection but the amounts, says they were unlawful, and it's filed on February 6th, clearly within that 60-day period, as was Mr. Holder's on behalf of the successor trustee, his objections to the withdrawal of those funds. Now, it is true that the court characterized those objections as a concern and therefore said it didn't rise to the level required by the trust document. But there's nothing in the trust document that requires a specific form of objection other than it being in writing. At page 19 of the bank's brief, they then say that there were no further responses following this February 6th letter which would have constituted some type of objection. And in the middle of that page, the bank writes, there was a response to it which was thereafter met with silence as far as Bank Champaign was concerned in their capacity as trustees. So I bring that to the court's attention only to ask the court to be mindful of what is in the record in this case, which is at page 653, which is a February 8th letter in which the defendant, Bank Champaign, advises that if they have overestimated the need for these advance retainers, there would be a refund. So there's a communication two days later. Additionally, in addition to providing the information, March 27th, which is a continuation of these correspondence set forth in the record, and this is at 658, Mr. Ballard, copying my client and the other co-administrators, writes to the successor trustee and says, under the trust document, we think 60 days has passed. Therefore, confirm the correctness of our understanding that the time has passed. Within the next five business days, we will deem a failure to respond as an agreement with our understanding. That's met on the following day from the successor trustee at 659 of the record with a letter that says, we do not confirm the correctness of your understanding. I previously sent you a letter of concern and objection to the fees charged and the retainers paid by you. As you know, the co-guardians for the sole income beneficiary have already filed objections in the guardianship manner relating to Sarah Judy, to which we have already made our entry of appearance. So there's a continuing sense of communication initiated by February 6th about the objections to these monies just being taken. That's met then, following that March 27th date, with a complaint on behalf of the successor trustee at 676 of the record, a petition for leave to intervene, and a proposed, assuming intervention is granted, objections to the petition for final approval of the guardianship account, in which they again raise these same withdrawals. And that was filed May 3rd of 2002. Within the 30-day period that the defendant in this case said they wanted a response in their correspondence to the successor trustee, dated April 2nd of 2002, which is at page 660 of the record. So we would respectfully suggest and urge this court to find that the circuit court was simply in error as a matter of law because it was ruled on as a matter of law in the pleadings. In finding that, the February 8th letter from the successor trustee, the petition for emergency relief filed by my client, were inadequate as a matter of law to constitute a written objection to the withdrawal of more than a quarter of a million dollars in the guardianship and trust assets. And we would respectfully suggest that the court erred in making that finding and coming to that conclusion. Would the issue of whether the objections were sufficient be a question of fact? Perhaps they're a mixed question of fact and law to this extent. Clearly, they qualify as being written. I would argue that they qualify as being objections. I think whether they are objections is a question of fact. The interpretation of the trust document, I think, would normally be considered a question of law, as the interpretation of a contract would normally be considered a question of law. So it would be mixed to that extent, I think. But the court dismissed this on the pleadings, finding, inter alia, that the objections from the successor trustee and my client were not written objections for purposes of the trust document. What basis did the trial court determine that the objection had to come from the successor trustee, as compared to your client? The implication was that as successor trustee, they had the responsibility of objecting to the final accounting. And it was the successor trustee to whom the assets would ultimately be transferred for management. Which raised a separate issue with respect to the termination fees. In this same set of proceedings, the circuit court determined... Well, what's your response to that, if that was the basis of the trial court's decision? There's no basis for it. Monies were taken from the trust, which the quoted material that I referenced is part of it. But monies were also taken from the guardianship, for which there is no trust document, and for which there is clearly a fiduciary duty. What they did was to split roughly in one-third portions, withdrawals from Sarah's trust, from Derwood's trust, the father, and from the guardianship accounts. And they have not returned any of those funds. After Mrs. Judy's death, were the beneficiaries entitled to pay out under the trust? They were, according to the trust documents. But because the will also then rolls into the trust assets, and the estate assets roll into that trust document, a complete distribution of the trust property cannot truly occur until the estate proceedings are completed. But as beneficiaries, they would be entitled to a portion of those trust assets, which in the scheme of things, would encompass all of the guardianship assets. Which remain. All of the estate assets, and then all of the trust assets. With respect to the termination fees, there was a brochure. That's the most complete and kindest example I can give. A brochure which made a very terse statement as to the fees that the defendant could charge in this case. And did not specify in any respect what would be required for the trust to obtain any kind of, quote, termination fee. This is at 576 of the record, and it says under a fee schedule, nothing more than termination fee, 1% of market value. It doesn't define termination fee. It doesn't indicate under what circumstances there could be a termination fee. Isn't there language below that 1% that talks about the termination fee may be more than that, if there are unusual costs of closing something? Your Honor, I'm not sure to what you're referring, but at page 580 of the record, there is a subsequent and attached schedule that has a listing for account termination fee, and the language of that may be what you're referring to. It says 1% of market value may be charged upon the closing of any account due to the labor intensive nature of the activity. That's what I'm talking about. Now, isn't that, it's not mandatory. No, and the accounts weren't closed. There was no evidence before the circuit court that the accounts were ever even closed. In fact, the correspondence which I referred to earlier between the successor trustee and Bank Champagne indicated that the account management was transferred. They simply took the money. I see my timing at this point. You'll have time for rebuttal. Counsel? Thank you. May it please the Court. Your Honors, it is important to remember, and I think we got a flavor of it over the last few minutes, but it's important to remember that the claims, the single claim in the Second Amendment complaint brought by Donald Judy as an individual must be broken up into two separate baskets, as it were. There's the termination fee relating to the guardianship account, and there's the termination fee relating to the trust account, and then there's the attorney retainers on the guardianship account and the attorney retainers on the trust account. So we have two separate claims within that single account, one regarding the guardianship estate and one regarding the trust estate. In that regard, I've got a question, not concerning the trust account, but concerning the guardianship account. Did Bank Champagne ever approach the probate court seeking approval of the expenditure of monies from the guardianship account for a termination fee or for prospective attorney's fees? From the guardianship account, yes. And there were specific objections to Bank Champagne's petition for final approval of its guardianship account. When did that happen? Shortly after. Shortly. This case has been going on a long time, Your Honor. Certainly within a year of the resignation. The resignation took place on December 31, 2001. Within that next calendar year, Bank Champagne filed its petition for final account and approval in the guardianship estate. So basically a year after the monies were taken. It was within the year. It could have been within three months. What happened at that proceeding? There were objections filed, Your Honor, and it is still pending. There were objections filed by then the successor trustee. As we heard from counsel, there was an objection filed in the form of an emergency petition by Mr. Judy. And there were objections filed by the other co-guardians. And that proceeding is still pending. Those objections have never been ruled upon. The petition for final account has never been ruled upon. And it was a basis for dismissal in front of the trial court that this entire claim is subject to dismissal or was subject to dismissal based on that prior action pending. The trial court did not reach the issue because it dismissed all of the claims and then her judgment on the pleadings as to all of the claims. It didn't have to reach that claim. But we mentioned it in our brief. That's certainly separate grounds this court can affirm based on the issue that there was a prior action pending against the same parties on the same issues. And as a matter of fact, it's still pending. Is there any involvement by the probate court required on the transfer of the duties of trustee from one national institution to another? Should it have been? I don't believe so. Who then consents to the transfer on the part of the successor trustee? Who's got the authority to do that? The resignation of Bank Champagne as trustee came by way of an agreement with the beneficiaries and the successor appointment of strategic as the successor trustee came by way of an agreement. There was an order entered in the probate proceeding regarding guardianship, but not with regard to the trustee. You said this is a duplicate proceeding, the objections in the guardianship in this lawsuit that Mr. Kirshner has filed. Isn't there a difference in the remedy requested? I mean, obviously the claim here is breach of fiduciary duty, not just objections to these attorney's fees and termination fees. But he's also asking for punitive damages. That is a distinction. But with regard to the 2615 law relating to prior action pending, the key would be same parties, same action. That there happened to be a slightly different remedy in the form of punitive, I don't believe would impact the prior action pending. Would he be able to ask for punitive damages for himself individually in the guardianship? I don't believe he would. So wouldn't consolidation make more sense than dismissal? Consolidation into the probate proceeding may make sense. And that action, remarkably, is still pending. With regard to the timing limitations on the trust claims, and again remember that it's just the trust claims, that the trust did provide for written objections within 60 days, otherwise the accounting of the bank champagne for year end 2001, which is the operative year, would be final, binding, and conclusive. We heard a few moments ago that while there was an objection, and it was from the successor trustee in the form of this letter exchange, the trial court determined that, as a matter of law, that it was not an objection. And I think to address your question, Justice Myerscough, as to whether that issue was a question of law or a question of fact, it seems to me that the best way to approach that is similar to a contract. If there's an ambiguity, then there's going to be questions of fact. If there's no ambiguity involved, then it can certainly be determined as a question of law. And the trial court reviewed the letters, and Mr. Kirshner quoted them correctly. The letter from Strategic Capital expressed a, quote-unquote, concern and sought a, quote-unquote, explanation. Within a matter of weeks, and this is all in the record, the bank champagne answered the question and gave the explanation. The trial court looked at those letters and determined as follows. The letters, quote, the letters say, now we're a little concerned about a couple of things. Could you address our concerns? There was a response to which was thereafter met with silence as far as bank champagne was concerned in their capacity as trustee of the two trusts in question. The letter does not, in my view, as a matter of law, suffice as a written objection as the provisions of the trust require. It essentially says, we're curious about a couple of things, and we have some concerns. Please respond to our concerns. The response was made. Nothing further was done within 60 days in their capacity as trustee of the trust. That's the trial court's ruling on this issue. Now, we heard moments ago about a subsequent letter from Strategic where it used the word objections. It had the information, and now it's saying, no, we don't agree that there's been a waiver. We object. That, without question, comes months after the 60 days had passed. So tell me, what was the basis for the trial court's ruling, or what is the basis for us to uphold the trial court's ruling, that Mr. Kirchner's objections in the guardianship account weren't good enough for the trust? The basis for the trial court's ruling there, and here's what the trial court said, that the February 2006-2002 objections, which are clearly within the 60 days, filed in the Judea State proceeding, quote, so far as the trust is concerned, were not, in my judgment, written objections made in a timely fashion. The trial court determined that an objection filed in the guardianship estate is exactly that. An objection filed in the guardianship estate. And that would not, as a matter of law, act as an objection to Bank Champaign in its capacity as trustee. Now, there's no question that Bank Champaign was wearing two hats, but there's also no question that it received, and this is undisputed, it received no formal objection in its capacity as trustee. And that was the basis for the trial court's ruling, that even though in the guardianship proceeding it received an objection, that did not trigger the required written objection in the capacity as trustee. With regard to the determination fees, I guess characterizing it as a brochure is not entirely unfair, but with regard to whether determination fees were agreed to, we need to look at far more than the brochure. We need to look to the allegations made by Donald Judy. Here's what Donald Judy alleged in his July 9, 2007 complaint against Bank Champaign. Bank Champaign, quote, agreed with representatives of the Judy Trust and the estate to charge services, which provided for an account termination fee to be charged in the event an account was terminated. That's Mr. Judy's allegation. Then he alleged January 14, 2008, in his First Amendment complaint, Bank Champaign agreed to provide services which, quote, provided for an account termination fee to be charged in the event an account was terminated. Then again, in September of 2008, the exact same allegation of agreement made by Mr. Judy, that there was an agreement which provided for the charging of a termination fee in the event an account was terminated. These are all evidentiary admissions. Mr. Judy has, in his own pleadings, admitted that there was an agreement regarding termination fees. The trial court relied upon the agreement and appropriately dismissed all of the claims relating to termination fees. Now there's termination fees regarding the trust account and termination fees regarding the guardianship account. Both were dismissed based upon not only the documents, which are part of this record, but upon Mr. Judy's own allegations that there was, quote, an agreement that a termination fee would be charged in the event an account was terminated. Now there was an issue raised in the briefs, and again today, that, well, the accounts weren't closed. Mr. Judy has filed pleadings in the trial court conceding that all of the assets were transferred from Bank Champaign to Strategic Capital. Is there something in the record to say, therefore, the account was, quote, unquote, closed? No, but there is a concession that all of the assets were transferred. There's nothing in the account. And the trial court, therefore, determined that the account was indeed closed. And in this regard, the court said, quote, the fee schedules do provide for a fee when they close the account. And that is clearly what they did. The bank closed their account so another bank could open an account. That's what happened. Is there anything in the nature of the fiduciary relationship of the trustee to the corpus of the trust that is inconsistent with charging a 1% termination fee? I don't believe so at all, Your Honor. Well, isn't it the duty of the trustee to not only manage the assets but conserve the assets and grow the assets for the benefit of the beneficiaries of the trust? And the trust in that capacity would have an obligation to conduct itself under commercially reasonable terms. That wasn't an issue raised in the trial court, but charging a termination fee upon the closing of the trust would certainly come within the scope of something that's commercially reasonable. And on the issue of how much, it's got to be remembered that with regard to the Second Amendment complaint, the issue pled, the basis of the claim was that there was no right to charge the fee. That's the issue. Is charging the fee commercially reasonable? And to answer your question, Your Honor, I would say yes. The fiduciary duty claim. I'm confused with what the trial court did here. Isn't what Mr. Kircher is asking for is the court to find a breach of fiduciary duty in that very act of charging that termination fee and taking those funds? Well, part of it. And with regard to that issue, the trial court determined that there was an agreement between the parties that the fees would be charged upon termination. And therefore, there could not have been a breach of duty. Okay. That was the reasoning of the trial court, which dovetails into the trial court's ruling on the motion for judgment on the pleadings regarding the guardianship claim. Now, there's been citation in front of the trial court and here that as a beneficiary of the trust, Mr. Judy was owed a fiduciary duty by Bank Champaign. And that's not an issue that was of concern to the trial court, addressed by the trial court in its ruling on the motion for judgment on the pleadings, because at that time, the trust claim had already been dismissed. The only claim existing at the time that the motion for judgment on the pleadings was filed was the claim with regard to asset transfers from the guardianship accounts. And a base, prima facie element of the case, I'm sorry. Go ahead, I'll finish you. A prima facie element of the case, obviously, is that there must be a duty in order for there to be a breach of fiduciary duty. And there are no facts alleged by Mr. Judy in his Second Amendment complaint that Bank Champaign owed him any duty whatsoever with regard to the guardianship proceedings and the guardianship accounts. The bank's duty was owed to the ward, not to Donald Judy individually. And that was the basis for the trial court's granting of the motion for judgment on the pleadings with regard to the guardianship. Who entered into the trust agreement initially? Mr. Judy's parents, both still alive? Yes. My recollection, Your Honor, was that Mr. Judy's parents were the original settlers of the trust agreements, and they themselves signed agreements which allowed for, for example... The 1%. No, that was a separate agreement, but allowed for the exculpatory clauses. Who signed the agreement for the 1%? There's no signed agreement regarding the 1%. The 1% agreement is in the documents, the fee schedules of the bank, and the agreement for termination fees is alleged not once, twice, but three times by Mr. Judy. Did that 1% provision exist at the time the trust was created? I don't know the answer to that question. I think I can say with certainty that the settlers didn't consider that when they were making the agreement. Well, my point is, if they were advised of that, and went ahead and placed their trust business with Bank Champaign, that was a pretty strong argument that they agreed to whatever fees the bank proposed to charge. But if the fee arose subsequent to the time the trust was created, that could be a different question, couldn't it? It could, but the agreement, as well as the Probate Act, provides that the trustee is allowed to charge reasonable fees for its services. But then a judge gets to decide what's reasonable, right? Yes. You don't get to come in and say, I've got, and I'll use Mr. Kirshner's word, I've got a brochure that says we get 1% of the corpus upon termination for whatever reason. I think a judge has to decide whether or not that's reasonable. Well, in this case, in September of 2008, Mr. Judy filed an amendment to his complaint, which appended the fee schedules, which provided for the 1%, along with his allegation that the bank and the Judys and the trust had entered into an agreement regarding the termination fee. So not only did he allege that there was an agreement, he appends to his complaint, which are part of his allegations under our rules, That's why I asked my question about time of creation of the trust between the Judy family and Bank Champaign, whether or not the termination fee was included in that. The trust only has fees that are reasonable. The 1% would not have been referenced. And who gets to decide what's reasonable? At the end of the day, the court would. That was my ultimate point. What about that 1%? That 1% isn't set in stone either. The language I had Mr. Kirshner read to me sounds to me as if it's under unusual circumstances with unusual closing costs that the 1% is permitted to be charged. There is no question under the language in the document that you read, Your Honor, the 1% fee is discretionary. And the bank exercised that discretion and charged it. So you're saying it's discretionary with the bank, as opposed to the judge needing to approve the 1%. If the issue is whether that amount is reasonable, I guess at the end of the day it would be the judge approving it. And let me go back to the question I was asking you about earlier about why Mr. Kirshner's objections in the guardianship were ignored as to the trust by the trial court. Clearly that pleading is objected to the removal of all the money from both the guardianship and the trust, is it not? It is. So it's simply the fact that Strategic didn't make this specific objection? No, it's the fact that that pleading was filed in the guardianship estate. Now, it's interesting to note... It doesn't say anything in the trust about where the objection has to be made or where it has to be filed. It's just within 60 days the bank has to know there are written objections, right? Yes, in its capacity as trustee. And this 2619 motion to dismiss was supported by the bank's affidavit that it had not received objections within 60 days. Now, certainly there could have been discovery on the point. There wasn't. The plaintiff didn't seek any discovery on that issue. The bank's affidavit said that... And the discovery usually happened after motions to dismiss. Well, this was a 2619 affirmative matter, so plaintiff certainly had the right to seek discovery on that affirmative matter. With regard to the statute of limitations issue on the cross-appeal, Your Honor... Excuse me, I'm sorry for harping on this. Are you saying the bank alleged it did not receive the objections that were filed in the guardianship? Yes, I'm saying that there is an affidavit in support of the motion to dismiss based on other affirmative matter that no objections were received by the bank in its capacity as trustee during the 60 days. And that went unrebutted by the plaintiff. But the same bank received the objections in their role as guardian? Yes. So it's just a question of which hat they were wearing? Yes. With regard to the statute of limitations, Your Honors... I see I'm out of time. I haven't addressed my cross-appeal issues. Can I have a few minutes? Yes, go ahead. Thank you, Your Honor. A couple. Mr. Judy filed his complaint alleging that in December of 2001 these improper transfers took place. The complaint in this action was not filed until July of 2006. The statute of limitations is five years. That's five years and some seven months. To avoid the problem, Mr. Judy says, well, but we're going to take advantage of the refiling provision of 13217, and this is a refiling of an earlier action. The problem confronted by Mr. Judy is that he was not a party to the original action in 2003, which was voluntarily dismissed in 2006, which would have allowed for a timely refiling. He was not a party to that action, so that the second action cannot be a refiling. The cases that we cite in the brief, Your Honor, the two that are significant is Don Sappold and Hamilton v. Chrysler hold two critical things. With regard to 13217, there has to be an identity of the parties. Otherwise, the refiling provision does not trust. Does the fact that he was an heir of Sarah make any difference? No. No, because it's a matter of capacities. In the first case, he was the co-guardian of the estate. In the second case, he brought it as an individual, and that issue was decided or raised and determined by the Hamilton case. This is at 281 Illinois Appellate 3rd, 284 cited in our brief. In that case, the plaintiff filed its first case in a derivative action, within the statute of limitations, took a voluntary, filed the second case as an individual. The court held that because those two capacities differed, the second case, not filed within the statute of limitations, could not act as a refiling of the first because there was no identity of the parties, because filing in one capacity is not the same as filing in a different capacity, and so it is here. Well, how is that any different than when the head of the Department of Corrections gets fired and we have a new head substituted in a prisoner case? I mean, his capacity obviously changed, and I just want to quote you from the statute, 13217. It says, then whether or not the time limitation for bringing such action expires during the pendency of such action, the plaintiff, his heirs, executor, or administrators may commence a new action within one year. And in your example, that would apply if in the second action, a successor co-guardian would have brought the claim. But how can you have a successor co-guardian when she died? No, I'm sorry. By that time, it would have been a successor in the estate. Although she died during the pendency of the second lawsuit. She did, in fact, die during the pendency of the second lawsuit. But on your Department of Corrections example, yes, the person can change, but in each filing, he or she would be bringing it in its capacity as the director of the department. Whereas in this case, the first case was brought in a capacity as co-executor, and the second case was brought as an individual. So in your hypothetical, if John Smith were the head of the department and the director, brings a claim, and then files another lawsuit outside of the statute of limitations, as John Smith, the two would not allow a 213 trick. So your reading of that section of the statute is that if she dies, they're just bottled up? No, not at all. Then the claim needs to be brought in a representative capacity as an executor of the estate, which clearly could have been done here because, as it turned out, Mr. Judy was a co-executor of the estate. Well, reading between the lines, and quite frankly, to both counsel, it would have been nice if we had the underlying pleadings in the probate cases that were below. I'm reading that there may have been cross-petitions to remove executors and stipulations to bring this only in an individual capacity. There were cross-petitions in the probate action to remove various people along the way. Just so both are aware, we may have to get copies of ongoing files out of Champaign County so we can try to make a little bit better sense of this. Thank you, Your Honor.  Rebuttal, please. Quickly, if I may, Your Honor. First, with respect to the second amended complaint and the assertion that there were admissions in the second amended complaint relating to the termination fee, I'd respectfully ask the court to look at that second amended complaint, 348-351, in the record. The assertions counsel attributes to it I do not believe are present. There was a representation that there was no counter-affidavit or challenge to the affidavit of Mark Ballard. That's incorrect. Mr. Holder filed an affidavit. Mr. Judy filed an affidavit. Mike McCormick, who was counsel for the estate, filed an affidavit. And Holder's affidavit directly refuting it is at 648-661. It's incorrect to say that the matters were resolved within 60 days because even as of March 25th, Ballard is writing to Dan Holder saying, please call or write to advise of the timing of the remaining asset transfers. This is at 657. So there was this ongoing dialogue. It wasn't concluded within 60 days. And, in fact, Bank Champaign knew there was an objection. With respect to the appointment for the trustee versus guardianship position, the bank was appointed as trustee by the court. It wasn't some written agreement that resulted in Bank Champaign being trustee. The court appointed them as trustee to manage the guardianship assets, and Bank Champaign was not the first trustee. It was a successor trustee. So to answer the court's inquiry about whether there was an agreement with Bank Champaign to act as trustee that would have been attributable to the settlers of the trust, the answer to that would be no. So if I understand you correctly, there was a prior trustee before Bank Champaign. Yes. There was a change from whatever institution that was to Bank Champaign that was confirmed by the probate court in Champaign County. Yes. And in the petition for emergency relief that's beginning at 665, paragraph 1 specifically says that a petition was filed seeking the removal as both trustee and guardian. It goes on to track the withdrawal of these assets. There cannot be a good-faith claim that Bank Champaign wasn't aware of the complaint about the withdrawal from the trust account for Sarah Derwood and the guardianship account. All of it was thought to be returned. Do we know if this 1% fee was charged by the original trustee? There would be nothing in the record to reflect that it was. Do we know if there was a 1% agreement between the individual? We do not. In fact, in my opening brief, I asked that the bank address that specific issue. Who was this agreement you claim to have been with? When was it entered into? How was it in writing, oral? What was the sum and substance of the agreement? They simply point back to the brochure, and our position is that termination fee doesn't apply when they resign. They resign as trustees. They resign from guardianship and transfer the assets. These accounts weren't closed. They resigned under threat of removal and the correspondence, which I pointed out to the court specifically from Mr. Ballard, acknowledges that the money was taken because of the threat of litigation over their mismanagement of the accounts. Thank you to both of you. The case is submitted, and the court stands in recess.